UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| RYAN BODDICKER, | ) | CIV. 09-4027-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| ESURANCE INSURANCE | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Ryan Boddicker, contends that defendant, Esurance

Insurance Services, Inc., violated the Consolidated Omnibus Budget

Reconciliation Act (COBRA) because Boddicker did not receive his COBRA

letter stating that he had a right to continue his healthcare coverage after

his separation from Esurance. Esurance denies that it violated COBRA. This

matter was tried to the court.[1]

## FACTS

The following constitutes the court's findings of fact, which are found

by a preponderance of the evidence, pursuant to Federal Rule of Civil

Procedure 52(a)(1):

---

[1] Boddicker also alleged a violation of the Family and Medical Leave Act
(FMLA) under both a retaliation theory and an interference theory. The court
granted summary judgment in favor of Esurance on the FMLA retaliation
claim, and Boddicker proceeded to a jury trial on the FMLA interference claim.
The evidence considered by the court on the COBRA claim consists of all the
evidence presented on the FMLA claim during the jury trial and the evidence
presented to the court after the conclusion of the jury trial.

I.    **Facts Found From the Evidence**

Boddicker joined the Navy as an operations specialist in 1993 and served on active duty until 1997, after which the Navy honorably discharged him. Tr. 26:1-25; Tr. 262:1-10. In 2003, Boddicker joined the Naval Reserves. Tr. 267:21-25. Esurance, based in San Francisco, California, provides insurance services and maintains a branch office in Sioux Falls, South Dakota. On August 8, 2004, Boddicker began working at Esurance's Sioux Falls, South Dakota, branch office as a licensed sales representative. Tr. 263:2-4.

The Naval Reserves called Boddicker to active duty in February of 2005. Tr. 268:5-7. Boddicker served in Kuwait with the Naval Reserves from February of 2005 until February 11, 2006. Tr. 268:5-7; Tr. 269:1-44.

In Kuwait, Boddicker served as a security guard for a port where all supplies, such as vehicles, equipment, and high-valued assets, were delivered to support the war in Iraq. Tr. 270:21-25-Tr. 271:1-5. While guarding a checkpoint, Boddicker experienced a traumatic event. Tr. 270:6-9. After that event, Boddicker received medical attention in Kuwait, and he began suffering from post-traumatic stress disorder (PTSD). Tr. 270-272. Boddicker was not recalled to active duty after he finished his tour of duty in Kuwait, and the Naval Reserves honorably discharged him in 2009. Tr. 274:22-25-Tr. 275:1-2.

After finishing his tour of duty, Boddicker returned to Esurance as a sales agent in March of 2006. Tr. 275:14-16. Boddicker continued to suffer from PTSD and its symptoms, and he eventually requested and received intermittent FMLA leave from Esurance. Ex. 64; Tr. 284:1-10. In September of 2007, Boddicker began taking block FMLA leave until he had used all of his FMLA leave as of November 5, 2007. Tr. 488:23-24. Esurance considered Boddicker to have resigned on November 5, 2007. Tr. 488:23-24.

Until his separation, Boddicker participated in the group health insurance plan through Esurance. Tr. 488:25-Tr. 489:1-2. After his employment ended with Esurance, Boddicker should have received a COBRA notice from Esurance stating his right to continue his health insurance.

While Esurance is its own COBRA plan administrator, Dockets 78-1; 78-2, the company utilizes a third party, COBRAServ, to send COBRA notices to eligible employees after their employment with Esurance ends.[2] Docket 123 at ¶ 7; Tr. 487:23-25. The parties stipulated that COBRAServ placed a COBRA notice dated November 29, 2007, in an envelope, with sufficient postage, addressed to Boddicker's post office box address. Docket

---

[2] Some witnesses testified that Ceridian sent Boddicker his November 29, 2007, COBRA notice and other witnesses testified that Ceridian, through its program COBRAServ, sent the letters. Because the parties agree that Ceridian or its program COBRAServ sent the letter and it is inconsequential as to whether Ceridian or COBRAServ sent the letter, the court will refer to the entity as COBRAServ for clarity.

3

123 at ¶¶ 7, 8; Tr. 487:23-25. Boddicker did not receive the November 29,

2007, COBRA notice. Instead, Boddicker received a COBRA notice in March

of 2009, after he initiated this action. Ex. 31.

   **A. Boddicker's Address**

   Ceridian, a third-party vendor used by Esurance, maintains

Esurance's employees' personal records, including their addresses.

Tr. 664:16-18. According to Patti Simpson, a human resources generalist

and one of Boddicker's supervisors, Ceridian has three parts. Tr. 634:1. The

Human Resources Information System (HRIS) is a program that only human

resources people may access. Tr. 634:1-2. The time card portion is where

the employees punch in and out every day using their employee clock

number. Tr. 634:2-4. The self-service piece is where the employees can

change their personal information and view their paychecks and benefits.

Tr. 634:6-7. The self-service piece is at issue in this case.

   When a new employee starts working at Esurance, a human

resources person creates a new account in Ceridian for that employee.

Tr. 634:13-14. Simpson created Boddicker's file as a new employee.

Tr. 634:14-16. Simpson also processed Boddicker's termination of

employment with Esurance in the Ceridian system. Tr. 633:3-8. Simpson

logged into Ceridian's HRIS part, found Boddicker's information, and in the

termination section, clicked "terminate," and put in November 5, 2007, as

the date of his termination. Tr. 633:10-14. A pop-up box came up and asked

4

if the employee qualified for COBRA benefits; Simpson testified that she clicked "yes," and she inputted the date his benefits should have accrued. Tr. 633:14-17. Simpson then clicked "save" and exited out of Ceridian. Tr. 633:17-18.

During trial, Simpson testified on direct examination that COBRAServ obtains its addresses through Ceridian's self-service database. Tr. 615:7-9. But when confronted on cross-examination with her deposition testimony where she stated that she did not know where COBRAServ obtains employees' addresses, Simpson admitted that she did not know where COBRAServ obtained its addresses. Tr. 615:10-14. Esurance presented no additional evidence showing how COBRAServ obtains addresses to mail employees their COBRA notices. The court finds that Esurance has not proven where COBRAServ obtained Boddicker's address when it mailed a COBRA notice to him.

If COBRAServ did obtain employees' addresses from Ceridian, the court will next consider the evidence regarding Boddicker's address. Boddicker testified that he changed his address in Ceridian to reflect his most current address. Tr. 492:22-25. While Boddicker was stationed in Kuwait on military duty, he maintained a post office box in Sioux Falls as his mailing address. Docket 123 at ¶ 5. When Boddicker returned from military duty, he rented an apartment in Tea, South Dakota, with an address on Brian Street and renewed his post office box for six months.

Tr. 491:20-22; Tr. 491:23-24; Tr. 489:3-8. In April of 2007, Boddicker

moved to Sioux Falls, South Dakota. Tr. 492:3-6. Around this time,

Boddicker canceled his post office box and his Sioux Falls street address

became his only mailing address. Tr. 493:12; Tr. 493:22-23.

Around the time that Boddicker moved to Sioux Falls in April of 2007,

he changed his address in Ceridian and entered his current, Sioux Falls

street address as his address. Tr. 492:22-25. Boddicker changed his

address in Ceridian because he knew that employees are responsible for

updating their information, Esurance sent periodic reminders to employees

reminding them to update their information in Ceridian, and Boddicker had

previously changed his information in Ceridian. Tr. 493:3-8; Tr. 664:18-20.

During the trial, Boddicker offered into evidence a letter dated

October 8, 2008, which was addressed to Boddicker's attorney from

attorney Ann Hajek, who had initially represented Esurance in this matter.

Ex. 73. Hajek's letter described Boddicker's tenure with Esurance and set

forth the number of hours of FMLA leave Boddicker had received. Ex. 73.

Hajek also stated that she was enclosing several documents with her

October 8 letter, including an October 16, 2007, letter that "Boddicker

received when he was out on [FMLA] leave." Ex. 73 at 1; *see also* Ex. 90

(containing an unredacted version of the October 16 letter). Exhibit 90 is a

letter dated October 16, 2007, from Simpson to Boddicker, which was

addressed to Boddicker's Sioux Falls street address. Ex. 90.

6

Esurance's trial attorney, George Wood, initially objected to the admission of the October 16 letter into evidence on the basis of lack of foundation. Tr. 500:5-10 ("I'll object, Your Honor. Lacks foundation. Miss Hajek is not here to testify that she wrote the letter, or that these were the actual documents that were attached to the letter."). Esurance protested that Boddicker "had years to take Anne Hajek's deposition. Discovery has been closed." Tr. 502:2-3. Esurance objected to the admission of the October 16 letter even though Simpson testified that she electronically sent Boddicker's personnel file to Hajek, Tr. 644-45, and Esurance did not object to the admission of any other letters from Boddicker's personnel file. While Simpson admitted that she sent the file to Hajek, she was unsure whether the October 16 letter was among the documents she sent. Tr. 644:24-Tr. 645:1-5 (Q: "If she [Anne Hajek] represents that it [the October 16 letter] was in that personnel file, you don't know how it would have gotten in there?" A: "It possibly could be in the personnel file. Based on the letter, I do not believe—again, I don't know where the letter came from. I don't know.").

After the court ruled that it would hold the record open until Hajek returned to South Dakota and proper foundation for admission of the exhibit into evidence could be established, Esurance withdrew its objections to the admission of the October 16, 2007, letter, and the court received the letter into evidence. The court finds that Esurance attempted to mislead the court as to the authenticity of the October 16, 2007, letter.

The October 16 letter ends with "Regards," leaves a space for a signature, and then states "Patti Simpson; HR Generalist" with her phone number. Ex. 90. The letter does not have Simpson's signature on it because Simpson electronically sent the letter, along with Boddicker's entire personnel file, to Hajek. Tr. 644. Boddicker testified that the October 16 letter was addressed to his correct Sioux Falls street address.

Simpson testified that when composing a letter to an employee, she copies the address from Ceridian and pastes the address into the electronic letter and on the envelope. Tr. 600:7-13. Simpson started every letter fresh, meaning that she never composed a letter from an old letter, and she always took the employee's address from Ceridian. Tr. 602:1-7. Simpson further testified that she does not deviate from this process of composing letters and Ceridian is the only location where she would find an employee's address. Tr: 601:15-20.[3]

When questioned about the October 16 letter, Simpson testified that she did not know where the address came from and she could not recall typing the letter. Tr. 605:9-13; *see also* Tr. 606:24-25 ("Yes, but it's not - - I mean it was not - - I don't know where it came from, to be honest with you."). Boddicker's attorney then read Simpson's deposition to her. In

---

[3] Julia Kuyper, an Esurance human resources generalist during the relevant time period who worked with Simpson in the Sioux Falls human resources department, confirmed that Simpson always used Ceridian to obtain an employee's address. Docket 157 at 5.

response to the question: "If you'll note the address on that letter, October 16, 2007, is that the same system [using Ceridian's address list] you would have used in obtaining that address as you did earlier addresses?" Simpson replied: "I'm sure I did. I don't know where else I would have got this address." Tr. 606:5-9; Deposition of Patti Simpson, Docket 57-4 at 28 (same).

The post office returned a number of letters to Esurance that it had mailed to Boddicker at his post office box address. A letter dated August 31, 2007, was returned by the post office on September 14, 2007, two months before Boddicker separated from Esurance. Ex. 66; Ex. 70; Tr. 619:9-18. A letter dated October 25, 2007, from Simpson to Boddicker was returned on February 26, 2008. Ex. 58A; Tr. 620:1-17. Boddicker's termination letter from Simpson dated November 5, 2007, was returned to Esurance on February 27, 2008. Ex. 66; Tr. 621:1-11. Esurance also received returned insurance licenses for Boddicker with return dates of December 16, 2008, April 13, 2009, and some undated returns. Tr. 622:6-9. Esurance's personnel file for Boddicker, however, does not include returned mail from COBRAServ or Ceridian dated November 29, 2007. Tr. 616:18-25; Tr. 617-621.

Simpson testified that she did not contact Boddicker or otherwise ensure that Esurance had Boddicker's correct address after receiving the numerous returned letters addressed to Boddicker's post office box address.

9

Tr. 622:15-21. Contrastingly, Kuyper testified that when she received a returned letter for an employee, she checked the employee's address in Ceridian and followed up with the employee to ensure that Esurance had the employee's correct address. Docket 157 at 5. Kuyper would either contact the employee at Esurance's office or, if that employee no longer worked at Esurance, she would call the employee using the employee's phone number listed in Ceridian's database. Docket 157 at 5. There is no dispute that Boddicker's phone number listed in Ceridian was his correct phone number during the time that Esurance received the returned letters.

**B.   Finding**

The court finds Boddicker's testimony that he changed his address in Ceridian to his Sioux Falls street address credible. Boddicker did not receive any mail at his post office box address after he moved from Tea to Sioux Falls. Tr. 493:9-12. The October 16, 2007, letter was addressed to Boddicker's Sioux Falls street address. Simpson testified that she always copies an employee's address from Ceridian to her word document when she composes letters to employees. Esurance stipulated that the letter came from Boddicker's personnel file and offered no reason why Simpson would have deviated from her standard process in drafting the October 16 letter. Thus, Esurance had Boddicker's correct Sioux Falls street address in the Ceridian system at the time Esurance, through COBRAServ, sent Boddicker

10

his COBRA notice. But Esurance did not send the notice to Boddicker's correct mailing address.

### C.   Damages

Boddicker did not have health insurance through his next job after Esurance, at Save Our Space. Tr. 507:2-5. Boddicker testified that he was receiving medical treatment for his PTSD during this time. Tr. 507:15-24. Boddicker did not have health insurance until May of 2008, when he received a disability rating from the government and received medical benefits through the Veterans Administration (VA). Tr. 508:1-6.

During the time that Boddicker did not have health insurance, the VA provided Boddicker with treatment and medication on a probationary basis. Tr. 508:1-6. Because the VA ultimately determined that Boddicker was disabled due to PTSD, he did not have to pay for the treatment he received from November of 2007 to May of 2008. Tr. 508:1-6.

## II.   Rejected Evidence

### A.   Exhibit 72

During trial, Esurance questioned Boddicker about Exhibit 72, which the court received into evidence. Exhibit 72 is a printout from Ceridian showing changes made to Boddicker's self-service account. Exhibit 72 has fourteen vertical columns and five horizontal rows. Ex. 72.

The first column, "ebclock" is the employee's clock number. Tr. 665:19-20. All five rows have the same number, "00774," in column one,

11

which is Boddicker's unique employee number. The second column,
"eplastname," is the employee's last name. Tr. 665:21-23. All five rows have
the same name, "Boddicker," in column two. The third column,
"epfirstname," is the employee's first name. Tr. 665:24-25; Tr. 666:1. All five
rows have the same name, "Ryan," in column three. The fourth column,
"epusername," represents the person who "touched the record" in the
Ceridian system. Tr. 666:2-6. The first row states "esupsimpson," and rows
two through five state "00774."

The fifth column, "epdateadd," shows the date the record was active in
the system, meaning the "date the system shows in its record that that
record is effective." Tr. 666:21-25; Tr. 667:1-2. Ceridian generates this date.
Tr. 666:21-25. The sixth column, "epdatebeg," shows when the specific
record began. Tr. 667:5-7. When looking across the row, the "epdatebeg" is
the date that the record was an active record in the Ceridian system. Tr.
667:9-12.

The seventh column, "epdateend," is when the record ended.
Tr. 667:14-16. The eighth column, "epdatemod," is the date when the record
in that row was modified. Tr. 667:17-20. Sandra Hynes, Esurance's vice
president of human resources and corporate representative during the trial,
explained that the records are like a "waterfall. You look at the record at the
top, and it links down to the next one, links down to the next one. Every one

12

of those records is like an imprint of something that was happening at a point in time." Tr. 664:1-13; Tr. 667:24-25-Tr. 668:1-4.

The ninth column, "epstreet1," contains the employee's street address. Row one has a Sioux Falls address at Tennis Lane and the remaining records contain Boddicker's post office box address. Column thirteen, "ephomephone," contains the employee's number. Row one has a number ending in "4964," row two has a number ending in "9060," and rows three through five have the same number ending in "4368." Column fourteen, "epemail," contains the employee's email address. Row one has no email address. Rows two through four have Boddicker's work email address, which he used at Esurance. Row five has Boddicker's personal email address.

At issue in this case are rows three through five of exhibit 72. Row three has an epdateadd of October 16, 2006, an epdatebeg of October 15, 2006, an epdateend of May 9, 2007, and an epdatemod of May 10, 2007. Row four has an epdateadd of May 10, 2007, an epdatebeg of May 10, 2007, an epdateend of November 5, 2007, and an epdatemod of May 10, 2007. Row five has an epdateadd of November 5, 2007, an epdatebeg of November 6, 2007, no epdateend, and an epdatemod of April 10, 2008. The remaining information in rows three through five is the same except that row 5 has a different email address–Boddicker's personal Yahoo email address instead of his work email address.

13

During cross-examination, Esurance questioned Boddicker on whether he made the last change in row 5 on November 6, 2007, which is in the epdatebeg column. Tr. 524:1-2. Boddicker replied no. Tr. 524:5-15. Boddicker testified that he did not know that his employment with Esurance ended on November 5, 2007, so he would not have made the change in row five on November 6, 2007. Tr. 524:25-Tr. 525:1-4. Esurance then asked Boddicker "[i]f the testimony in this case is that the only person that has access to the Ceridian system to make changes to your account is you, you have nothing to dispute that. Do you?" Tr. 525:10-13. Boddicker replied, "I don't have any evidence to dispute that, no." Tr. 525:14.

On redirect examination, Boddicker explained that he never accessed the Ceridian system outside of work, and he did not know that he could access the system from home. Tr. 527:1-6. Boddicker's attorney then questioned him on whether he could have made the changes to row five at 5:11 p.m., the time under the epdateadd column in row five, and Boddicker testified that he could not have made the change at that time. Tr. 528:1-25-Tr. 529:1-7. Regarding the change in Boddicker's email address in row five, Boddicker testified that he did not recall ever giving his Yahoo email address to anyone at Esurance. Tr. 531:24-25.

Simpson testified that in Exhibit 59A, a letter dated November 5, 2007, from her to Boddicker, she advised Boddicker that he would continue to have access to Ceridian. Ex. 59A. Simpson testified that Boddicker could

14

have typed "Ceridian.Esurance" into Google and would have been able to obtain the necessary link to access Ceridian and change his personal records. Tr. 630:12-14.

Exhibit 59A is addressed to Boddicker at his post office box address. Ex. 59A. In the November 5 letter, Simpson asked Boddicker to "make sure that you change your address in the Ceridian system to a personal email address." Ex. 59A. Simpson testified that the change in row five was a change to Boddicker's email address and that change was consistent with her instructions in the November 5 letter. Tr. 632:23-25-Tr. 533:1-3. On redirect, Simpson conceded that Boddicker never received that letter because the November 5 letter was returned to Esurance by the post office. Tr. 639:6-10.

Esurance called Hynes to testify about Exhibit 72. The court asked Hynes if it was correct that Boddicker went into the system on November 6 at 5:11 p.m. and changed his email address. Tr. 679:23-25-Tr. 680:1-2. Hynes stated that was false. Tr. 680:3. Instead, someone went into the Ceridian system on April 4, 2008, and updated Boddicker's email address. Tr. 680:4-6. This change is reflected in the "epdatemod" column in row 5 on Exhibit 72. Ex. 72. According to Hynes, no person directly touched Boddicker's record on November 5, 2007. Tr. 680:7-9. The only reason that November 5, 2007, is listed as a date in row five is because Simpson made a

general entry into Boddicker's personnel record to terminate him from Esurance on November 5, 2007. Tr. 680;10-13.

If the court believes Hynes's testimony, then Simpson falsely testified about the information contained in Exhibit 72. Simpson maintained that Boddicker complied with her letter dated November 5, 2007, which directed Boddicker to change his email address in Ceridian, even though she knew Boddicker did not receive her November 5, 2007, letter. Boddicker did not update his email address on November 6, 2007. Instead, his email address was updated on April 4, 2008. Because Simpson's testimony was impeached numerous times, including specifically whether Boddicker complied with Simpson's request to update his email address in the November 5 letter, the court finds that Simpson is not a credible witness.

Hynes appears to have the most experience with Exhibit 72. But Hynes is not a credible witness. Even though Hynes is Esurance's vice president of human resources, she has no special training with computers and did not create Exhibit 72.

Furthermore, Hynes signed some of the pleadings for Esurance and has been Esurance's "point person" for this litigation. Tr. 672:1-8. On March 31, 2010, Esurance moved for summary judgment on all of Boddicker's claims, including his COBRA claim. Docket 48. In its memorandum in support, Esurance represented to the court that Ceridian was its COBRA plan administrator. *See* Docket 113 at 5-6 (explaining

16

Esurance's representations to the court). But in its 2007 and 2008 Forms 5500, which were filed with the Department of Treasury, Esurance listed itself as the COBRA plan administrator. Docket 78-1; Docket 78-2. Hynes signed both of the Forms 5500 under penalty of perjury. Docket 78-1; Docket 78-2.

In granting summary judgment on Boddicker's COBRA claim, the court specifically relied on Esurance's representation that Ceridian, not Esurance, was Esurance's plan administrator, which was false information. Neither Esurance nor Hynes informed the court of this factual mistake. In granting Boddicker's motion for reconsideration, the court found that "[a]fter reviewing the newly offered evidence, it is clear that Esurance engaged in a misrepresentation and fraud in its earlier briefs to the court on the summary judgment motion." Docket 113 at 18. During cross-examination, Boddicker's attorney questioned Hynes about the fraud that Esurance committed on the court. Hynes attempted to differentiate between "plan administrator" and "administering the plan," even though she signed the 2007 and 2008 Forms 5500 with the United States Treasury under oath identifying Esurance as the COBRA plan administrator. Tr. 674. The court finds that Hynes is not a credible witness.

Esurance offered varying interpretations of Exhibit 72 through Simpson and Hynes. Neither Simpson nor Hynes is a credible witness. While Exhibit 72 shows what direct changes were made to Boddicker's personnel

file in the Ceridian system, outside changes also appear on Exhibit 72. For example, Simpson terminated Boddicker on November 5, 2007, and that date shows up on row five in the "epdateadd" column. But Exhibit 72 does not reflect the nature of the change made on November 5, 2007. Given the varying interpretations of Exhibit 72 offered by Esurance through Simpson and Hynes, the credibility issues with Simpson and Hynes, and the difficulty in determining exactly which changes were made to Boddicker's record in Ceridian, the court gives little, if any, weight to Exhibit 72.

### B.   Pay Stubs

Esurance maintains that because Boddicker's pay stubs were addressed to his post office box address, Boddicker did not update his address in the Ceridian system. But Boddicker did not recall receiving any mail from Esurance at his post office box address. Tr. 494:11-2. Instead, Boddicker testified that Esurance distributed mail to employees at their desks. Tr. 494:7-8. Boddicker received his pay stubs from one of his supervisors, Shawn Uhlinger, at his desk. Tr. 494:16-17. The pay stubs had Boddicker's address as his post office box address. Tr. 494:23-24. Boddicker testified that he often did not even look at the pay stubs and never noticed that his pay stubs had his post office box address. Tr. 495:3. Instead, he checked his bank account online to ensure that he received the proper amount of pay from Esurance. Tr. 495:3-10.

18

## C.   Boddicker's Navy Address

During trial, Esurance maintained that the post office box address was Boddicker's correct address because Boddicker's letters from the Navy were also addressed to Boddicker's post office box address. Tr.515-517. Boddicker testified that letters from the Navy clearly listed the post office box as his address. Boddicker stated that he never corrected his address with the Navy because he always picked up his papers from the Navy's command office and addresses were small details to him that he skipped over. Tr. 516:7-10.

The court finds Boddicker's testimony credible regarding his address with the Navy and that Boddicker picked up his mail from the Navy's command office. Because Boddicker's post office box address was inactive during the time when he was still active in the Naval Reserves, the only way that Boddicker could have received his mail from the Navy, which was addressed to his post office box address, would have been if Boddicker picked up his mail from the Navy's command office. The court finds the fact that Boddicker's mail from the Navy was addressed to his post office box is inconsequential in determining whether Boddicker updated his address with Esurance.

## D.   W-2 Forms

Esurance also offered Boddicker's 2007 W-2 form, which had his post office box address on it. Ex. 133. Boddicker testified that he filed his taxes

in 2008 and probably would have used his 2007 W-2 form, but he did not

receive his 2007 W-2 through his post office box because he did not have

his post office box in January of 2007. Tr. 518:1-11. The W-2 form says that

it was a "re-issued" statement. Ex. 133. Boddicker speculated that it was re-

issued because the initial W-2 did not have his correct address and he had

to ask Esurance to provide a copy for him. Tr. 526:13-15.

  The court is not persuaded that because Boddicker's W-2 form had

his post office box as his address that Boddicker failed to update his

address in Ceridian. Furthermore, Boddicker's post office box address was

inactive at the time that Boddicker's W-2 form would have been mailed to

that address. The court finds that Boddicker's W-2 form addressed to the

post office box does not alter the court's previous findings that Boddicker

updated his address in the Ceridian system and Esurance had Boddicker's

correct Sioux Falls street address when it should have mailed Boddicker's

COBRA notice to him.

**LEGAL CONCLUSIONS**

## I. COBRA Notice

  Esurance's medical benefits plan is governed by ERISA and COBRA.

Docket 161 at 13. Under COBRA, employers are required to notify

employees about their COBRA rights after a qualifying event occurs. 29

U.S.C. § 1166(a)(4)(A). A qualifying event includes an employee's

termination. 29 U.S.C. § 1163(a)(2); *see also Chesnut v. Montgomery*, 307

20

F.3d 698, 700 (8th Cir. 2002) (finding that leaving one job for a better job is a qualifying event). An employer can delegate its COBRA duties to a plan administrator such as an insurance agent or other professional familiar with COBRA. *Chesnut*, 307 F.3d at 730.

Esurance is its own COBRA plan administrator. Dockets 78-1, 78-2. While Esurance may have a third party send out COBRA notices, Esurance retains liability under COBRA as the plan administrator. *Crotty v. Dakotacare Admin. Servs., Inc.*, 455 F.3d 828, 829 (8th Cir. 2006) (reasoning that COBRA requires "administrators of covered group health plans to notify terminated employees that they have the option of continuing their benefits after their employment ends." (citing 29 U.S.C. §§ 1161(a), 1163, 1166(a)(4))); *see also Smith v. Rogers Galvanizing Co.*, 128 F.3d 1380, 1383 (10th Cir. 1997) (reasoning that when the "defendant was both the sponsor and the administrator of the insurance plan" that "it was defendant's duty under COBRA to notify" the employee that his "employment termination was a qualifying event that afforded [him] the right of continuation coverage.").

A plan administrator bears the burden of proving that it provided notice consistent with COBRA's requirements. *Crotty*, 455 F.3d at 830 (citing *Stanton v. Larry Fowler Trucking, Inc.*, 52 F.3d 723, 728-29 (8th Cir. 1995), *overruled on other grounds by Martin v. Ark. Blue Cross & Blue Shield*, 299 F.3d 966 (8th Cir. 2002) (en banc)). " '[A] good faith attempt to comply

21

with a reasonable interpretation of the statute is sufficient' " to meet the plan administrator's burden of proof. *Id.* (quoting *Chesnut*, 307 F.3d at 702). A good faith attempt is met when the plan administrator provides a COBRA notice to the employee "by means reasonably calculated to reach the recipient." *Id.* at 829 (reasoning that COBRA "does not require proof of actual notice.").

In *Crotty v. Dakotacare Administrative Services, Inc.*, 455 F.3d 828 (8th Cir. 2006), the Eighth Circuit analyzed what evidence a COBRA plan administrator must present to prove that it, in good faith, complied with COBRA. *Id.* at 830. In *Crotty*, the COBRA plan administrator first "produced an audit report that indicated that its computerized tracking system had generated a notice letter to [plainitff] around the time that she was terminated." *Id.* Second, the plan administrator "presented testimony from one of its employees about the company's procedure for mailing notification letters," including testimony about how that particular notice was "placed by hand into an addressed envelope that was generated by a separate computer program . . . ." *Id.* Third, the plan administrator had to show that it followed its established system for sending out the particular notices in question. *Id.*

The parties stipulated that COBRAServ placed in the mail a COBRA notice dated November 29, 2007, to Boddicker at his post office box

22

address. Docket 123 at ¶ 7. Esurance has met its burden to show that a notice was generated and mailed and, thus, this case centers on whether the system used by Esurance meets COBRA's good faith standard.

Courts require a COBRA plan administrator to establish its "customary mailing practices" and prove it sent the COBRA notice to the correct address. *Roberts v. Nat'l Health Corp.*, 133 F.3d 916, No. 97-1613, 1998 WL 10375, at *1 (4th Cir. 1998) (reasoning that "the district court held that NHC's established notification procedure, combined with a copy of the COBRA report stamped with the day the letter was mailed" fulfilled the COBRA plan administrator's burden of proof). If the plan administrator uses a computerized notice procedure, the system must be reliable and produce reliable business records to indicate that a letter was sent to the correct address. *Myers v. Carroll Indep. Fuel Co.*, No. RDB 09-1633, 2011 WL 43085, at *10 (D. Md., Jan. 6, 2011).

Esurance presented *no* reliable, first-hand evidence about how COBRAServ generates an employee's address when it produces and sends out a COBRA notice. Simpson and Hynes testified that COBRAServ uses the employee's address contained in the self-service portion of the Ceridian system, but neither Simpson nor Hynes work for COBRAServ or manage COBRAServ's system in their roles at Esurance. Instead, Esurance assumes

23

that COBRAServ uses the employee's information contained in the employee's self-service portion of the Ceridian database.

Even though Esurance uses COBRAServ to physically send out its COBRA notices, because Esurance is its own COBRA plan administrator, it maintains the ultimate responsibility to prove that an adequate system existed which sent Boddicker his COBRA notice. *Smith*, 128 F.3d at 1383. Esurance failed to meet its burden of proof on how COBRAServ generates an employee's address when sending an employee a COBRA notice, and, thus it has not proven that it made a good faith effort to comply with COBRA.

Even assuming that COBRAServ used the employee's self-service personal records to generate addresses for COBRA notices, as Esurance claims, Esurance has not met its burden of proof. Mailing a COBRA notice to the "participant's last known address" satisfies the plan administrator's COBRA duty. 29 C.F.R. § 2590.701-5(a)(4)(I). The issue here is a factual one, namely whether Esurance knew that Boddicker's last address was his Sioux Falls street address, not his post office box address.

Esurance argues and Boddicker acknowledges that he was responsible for updating his personal information in Ceridian's self-service system. Esurance contends that according to Exhibit 72, Boddicker never changed his Sioux Falls address.

24

But, as stated above, the court affords Exhibit 72 little, if any, weight. Boddicker impeached Simpson numerous times throughout her testimony and Hynes committed a misrepresentation and fraud on the court at the summary judgment level. Not only did Simpson and Hynes offer varying interpretations of Exhibit 72, but neither witness was credible. Esurance never had a computer specialist, Ceridian administrator, or even Marco Fernandez, Esurance's point person for Ceridian, testify about Exhibit 72.

Moreover, Exhibit 72 does not fully capture the changes made in Ceridian to an employee's record. For example, Simpson entered Boddicker's termination into Ceridian on November 5, 2007, but Exhibit 72 does not reflect that Boddicker was terminated. Because Exhibit 72 is confusing and misleading, the court will rely on credible testimony and the other exhibits received into evidence.

Boddicker testified that he changed his address in Ceridian from his post office box to his Sioux Falls street address. At some point, Esurance possessed Boddicker's Sioux Falls street address as shown by the October 16, 2007, letter drafted by Simpson to Boddicker and addressed to his Sioux Falls street address. Ex. 90. Simpson testified that she always copies and pastes addresses from the Ceridian system into a letter addressed to an employee. Kuyper confirmed that this was Simpson's general practice. While Simpson repeatedly testified that she did not recall

drafting the October 16, 2007, letter, Esurance stipulated that the letter came from Esurance's files. Docket 123 at ¶ 5. Boddicker's testimony, combined with Exhibits 72 and 90, shows that Boddicker notified Esurance that his correct address was his Sioux Falls street address.

Esurance also received returned letters in February of 2008 stating that the mail addressed to Boddicker at his post office box was undeliverable because the post office box address was no longer registered to Boddicker. One letter was sent in September of 2007 and another was sent in October of 2007, so when Esurance received the returned letters in February, it should have known that Boddicker had not received the November 29, 2007, COBRA notice sent to his post office box address. Esurance did not follow up with Boddicker to ascertain his correct address, even though Kuyper testified that she normally called an employee if she received a returned letter or otherwise noticed that an employee's address was incorrect in the employee's self-service Ceridian database.

Esurance is unaware whether the post office returned the November 29 notice to COBRAServ or Esurance as undeliverable. According to Kuyper, Esurance would not have a record of whether the November 29 notice was returned because the post office would have returned the letter to COBRAServ, even though Esurance, not COBRAServ, is Esurance's plan administrator and, thus, is responsible for sending a COBRA notice to an

26

employee's correct address. Boddicker did not receive his COBRA notice until March 19, 2009. Docket 123 at ¶ 9.

Boddicker has shown, by a preponderance of the evidence, that Esurance knew Boddicker's correct address was his Sioux Falls street address as of October 16, 2007, and, at the latest, in February of 2008. But Esurance still allowed COBRAServ to send Boddicker's COBRA notice to his post office box address and never followed up with COBRAServ when Esurance knew that Boddicker's correct address was the Sioux Falls street address. Because Esurance did not, in good faith, comply with COBRA, it has violated 29 U.S.C. § 1166(a)(4)(A).

## II.   Damages

COBRA provides a statutory penalty when a plan administrator fails to comply with COBRA's notice provisions. 29 U.S.C. § 1132(c)(1). "[A]n ERISA plan administrator 'may in the court's discretion be personally liable' up to $100 per day from the day of his or her failure to comply with the notification requirements of 29 U.S.C. § 1166(a)(4)." *Starr v. Metro Sys., Inc.*, 461 F.3d 1036, 1040 (8th Cir. 2006) (quoting 29 U.S.C. § 1132(c)(1)(A)). Effective August of 1997, the statutory penalty under ERISA was increased to a maximum of $110 a day. 29 C.F.R. § 2575.502c-1.

The purpose of COBRA's "statutory penalty is to provide Plan Administrators with an incentive to comply with the requirements of ERISA

and to punish noncompliance." *Starr*, 461 F.3d at 1040 (citing *Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 948 (8th Cir. 1999); *Chesnut*, 307 F.3d at 704). Section 1132(c) is punitive in nature. *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1495 (11th Cir. 1993). District courts have discretion to award statutory civil penalties and the appellate court only reverses for an abuse of discretion. *Delcastillo v. Odyssey Resource Mgmt., Inc.*, 431 F.3d 1124, 1129 (8th Cir. 2005).

The employer must notify the plan administrator within 30 days of the date of the qualifying event that a COBRA notice is necessary. 29 U.S.C. § 1166(a)(2). Plan administrators must notify an employee of his COBRA rights within 14 days of the employee's termination. 29 U.S.C. §§ 1166(a)(4)(A), (C). If the employer is the plan administrator, then the employer has 44 days to notify an employee of his COBRA rights. 29 C.F.R. § 2590.606-4(b)(2); *see also Myers,* 2011 WL 43085, at *8 (reasoning that an employer that was also the plan administrator had 44 days to provide the employee with his COBRA notice); *Roberts v. Nat'l Health Corp.*, 963 F. Supp. 512, 515 (D.S.C. 1997) (same).

Boddicker requests $48,500 in damages in addition to attorney's fees, costs, and expenses for Esurance's COBRA violation. Boddicker states that he went 499 days, excluding November 5, 2007, and March 19, 2009, without notice that he could extend his health care coverage through

COBRA. Boddicker, subtracted 14 days from the 499 days to allow Esurance its statutory time to send the COBRA notice. The appropriate statutory exclusionary period, however, is 44 days, for a total of 455 days without a COBRA notice.

The court must determine whether a statutory penalty is appropriate for this time period and, if so, what the penalty should be:

> In exercising its discretion to impose statutory damages, a court primarily should consider "the prejudice to the plaintiff and the nature of the plan administrator's conduct." *Kerr*, 184 F.3d at 948. Although relevant, a defendant's good faith and the absence of harm do not preclude the imposition of the § 1132(c)(1)(A) penalty. *Chesnut*, 307 F.3d at 703.

*Starr*, 461 F.3d at 1040; *see also Chesnut*, 307 F.3d at 704 ("The employer's good faith and the absence of harm are relevant in deciding whether to award a statutory penalty." (citing *Wilson v. Moog Auto., Inc. Pension Plan*, 193 F.3d 1004, 1010 (8th Cir. 1999); *Mlsna v. Unitel Comm'cns, Inc.*, 41 F.3d 1124, 1130 (7th Cir. 1994))).

**A.   Good Faith**

The good faith analysis for COBRA damages appears to mirror the good faith analysis for determining whether the plan administrator complied with § 1164(a)(4)(A). *In re Interstate Bakeries Corp.*, 446 B.R. 336, 342 (W.D. Mo. 2011) (reasoning that the court determines whether the employer engaged in any bad faith in complying with COBRA's mandates). The evidence shows that Esurance had Boddicker's correct address as of

October 16, 2007, and, at the latest, in February of 2008. Boddicker testified that he changed his address in the Ceridian system and Esurance offered no credible evidence to contradict Boddicker's testimony.

Esurance never followed up with COBRAServ to determine where COBRAServ sent the COBRA notice, even though Esurance is its own COBRA plan administrator. Esurance could have, and according to Kuyper, should have, called Boddicker when it received the returned mail to inquire whether he had changed his address. Moreover, Esurance is a substantial entity that should have the necessary resources with which it can comply with COBRA's provisions. *See Lowe v. McGraw-Hill Cos., Inc.*, 361 F.3d 335, 338 (7th Cir. 2004) (finding that the district court did not abuse its discretion in awarding an ERISA penalty when the plan administrator had substantial resources and failed to fulfill its statutory duty).

After failing to properly send Boddicker his COBRA notice, Esurance tried to conceal its COBRA violation. At the summary judgment stage, Esurance committed a fraud and misrepresentation on the court in asserting that COBRAServ, and not Esurance, was Esurance's COBRA plan administrator. During trial, Hynes insisted that Esurance meant to draw a distinction between "plan administrator" and "administering the plan." Even if this is true, Esurance did not correct the court on its factual mistake in concluding that COBRAServ was Esurance's COBRA plan administrator.

Then again during trial, Esurance attempted to mislead the court about the authenticity of the October 16, 2007, letter, and Simpson's use of Ceridian to find Boddicker's street address when she drafted the October 16 letter. Esurance's multiple attempts to mislead the court show that Esurance has not acted in good faith.

Bad faith gives teeth to a district court's discretionary statutory penalty and, if there is bad faith and the district court does not impose the statutory penalty, the appellate court may find that the district court abused its discretion. *See, e.g., Leister v. Dovetail, Inc.*, 546 F.3d 875, 884 (7th Cir. 2008) ("But in this case there was both prejudice and bad faith. The failure to award penalties was, in the circumstances, an abuse of discretion." (citations omitted)).

Even if prejudice is lacking, the absence of good faith supports a statutory penalty. *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1494 (11th Cir. 1993). In fact, if the district court refuses to impose a penalty because prejudice is lacking, it may have abused its discretion.

> Since a plan participant would rarely be able to demonstrate that the failure to provide a timely statement of benefits in itself prejudiced the participant, the intent of Congress in enacting section 1132(c) would be frustrated by such a requirement. Additionally, the penalty range of up to $100 per day is unrelated to any injury suffered by the plan participant, suggesting that section 1132(c) is intended to punish noncompliance with the employer or administrator's disclosure obligations and not to compensate the participant.

31

*Id.*; *see also Sandlin v. Iron Workers Dist. Council*, 716 F. Supp. 571, 574 (N.D. Ala. 1988) ("There is nothing in § 1132(c) which established monetary loss as a prerequisite to the 'up to $100 a day,' which is the nature of punitive damages designed more to punish the intransigent administrator and to teach ERISA fiduciaries a needed lesson than to compensate the pensioner for actual loss."), *aff'd*, 884 F.2d 585 (11th Cir. 1989).

In *Moothart v. Bell*, 21 F.3d 1499 (10th Cir. 1994), the district court awarded a statutory penalty of $30 a day for an ERISA administrator that acted in bad faith in not timely disclosing documents, even though prejudice was not present. *Id.* at 1506. In upholding the penalty, the appellate court reasoned "that the penalty statute is just that, a penalty. . . . The focus is necessarily on the plan administrator's actions, not the participant's." *Id.* at 1506-07.

Courts have awarded a similar penalty when neither prejudice nor bad faith existed. *See, e.g., Nero v. Univ. Hosps. Mgm't Servs. Org.*, No. 1:04CV1833, 2006 WL 2933957, at *5 (N.D. Ohio Oct. 12, 2006) (awarding a penalty of $7,020 when the employee suffered no prejudice and the employer did not act in bad faith "to impress upon [the plan administrator] the importance of such compliance," which "represents a $15 per day penalty for 468 days").

### B.   Prejudice

Under the prejudice analysis, Boddicker applied for disability benefits through the VA in January of 2008. The VA granted him disability benefits in May of 2008. During the intervening five months, Boddicker continued to receive treatment for his PTSD. While the VA provided probationary coverage for his treatments before he received his disability determination in May of 2008, Boddicker testified that he was anxious during those five months because he was uncertain whether he would be able to afford his treatment.

Boddicker suffered from PTSD, including its symptoms of anxiety. Esurance knew about Boddicker's struggle with PTSD and anxiety because Boddicker requested and Esurance granted FMLA leave to Boddicker so he could deal with PTSD and its symptoms. Uncertainty and anxiety over medical payments is prejudicial for anyone, but is particularly prejudicial for someone suffering from PTSD. Boddicker received his disability rating from the VA in May of 2008. It is unclear from the record on which day Boddicker received his VA disability benefits, so the court will assume that he received the benefits on May 31, 2008. Thus, prejudice existed from November 29, 2007, until May 31, 2008, when Boddicker received his disability rating and benefits from the VA.

33

## C.  Penalty Amount

When the plan administrator acted in good faith *or* there was no
prejudice to the employee, courts have awarded a statutory penalty between
$45-$55 a day. *See, e.g.*, *Fadalla v. Life Auto. Prods., Inc.*, No. 2:06-cv-
02679, 2009 WL 3295369, at *4 (W.D. Tenn. Oct. 13, 2009) (imposing a $55
penalty per day that the employee was prejudiced)*; Holford v. Exhibit Design
Consultants*, 218 F. Supp. 2d 901, 909 (W.D. Mich. 2002) (awarding a
statutory penalty of $55 a day when the plan administrator acted in good
faith and prejudice was not present, for a total award of $27,610); *O'Shea v.
Childtime Childtime, Inc.*, No. 01-CV-1264 (DRH), 2002 WL 31738936, at *7
(N.D.N.Y. Dec. 2, 2002) (holding that a penalty of $50 a day, for a total of
$2,300, was appropriate when the employee was prejudiced but the
administrator did not act in bad faith); *Torres-Negron v. Ramallo Bros.
Printing, Inc.*, 203 F. Supp. 2d 120, 122 126 (D.P.R. 2002) (awarding a
penalty of $45 a day, for a total of $12,195, when the plan administrator
acted in bad faith and there was no prejudice to the employee); *Garred v.
Gen. Am. Life Ins. Co.*, 774 F. Supp. 1190, 1201 (W.D. Ark. 1991) (reasoning
that a penalty of $50 a day, for a total of $15,775, was appropriate when the
plan administrator either "ignored a request for information, or willfully
refused to provide the information" requested by the employee); *Thomas v.
Jeep-Eagle Corp.*, 746 F. Supp. 863, 864-85 (E.D. Wis. 1990) (awarding a

34

penalty of $50 a day, for a total of $6,450, when the plan administrator failed to respond to an employee's request for information).

When the court finds both prejudice and bad faith, a larger penalty is warranted. *See, e.g.*, *Middleton v. Russell Group, Ltd.*, No. 95-CV-630, 1998 WL 34007358, at *6 (M.D.N.C. Feb. 23, 1998) (awarding the maximum statutory penalty when the plan administrator acted in bad faith and the employee was prejudiced by the lack of COBRA notice); *Rodriguez v. Int'l Coll. of Bus. & Tech., Inc.*, 356 F. Supp. 2d 92, 95-96 (D.P.R. 2005) (reducing a penalty from $80 to $65 a day, for a total penalty of $32,825, when there was prejudice and bad faith because the employee did not object to the reduction).

Esurance acted in bad faith and Boddicker suffered prejudice from January 12, 2008, to May 31, 2008, a time span of 140 days. Accordingly, the full statutory penalty of $110 for those 140 days, or $15,400, is appropriate.

For the remainder of the time Boddicker remained without his COBRA notice, from May 31, 2008, to March 19, 2009, or 292 days, Boddicker did not suffer prejudice but Esurance continued to act in bad faith. An award of $25 a day for 292 days, or $7,300, for a total penalty of $22,700, is appropriate.

ERISA also provides that a prevailing party may receive its reasonable attorney's fees and costs. 29 U.S.C. § 1132(g)(1). "[A]lthough there is no presumption in favor of attorney fees in an ERISA action, a prevailing plaintiff rarely fails to receive fees." *Starr*, 461 F.3d at 1041 (citing *Martin*, 299 F.3d at 972). Because Boddicker is the prevailing party in this COBRA action, he may be able to receive his reasonable attorney's fees and costs. After Boddicker submits an affidavit detailing his fees, costs, and expenses, the court will employ the five-factor test, as announced in *Hebert v. SBC Pension Benefit Plan*, 354 F.3d 796, 801 (8th Cir. 2004), to determine whether the fee request is reasonable.

## CONCLUSION

Boddicker alleges that Esurance, as the plan administrator for its COBRA plan, violated COBRA because it failed to send him the statutorily required COBRA notice to the correct address. After conducting a bench trial on this issue, the court agrees with Boddicker that Boddicker's last known address was his Sioux Falls street address, and Esurance had Boddicker's Sioux Falls street address in the Ceridian system. Thus, sending Boddicker's COBRA notice to his post office box address violated COBRA. Because Esurance acted in bad faith regarding Boddicker's COBRA notice and because Boddicker suffered some prejudice, a statutory penalty in the amount of $22,700 is appropriate. Accordingly, it is

ORDERED that judgment will be entered in favor of plaintiff, Ryan Boddicker, and against defendant, Esurance Insurance Services, Inc., in the amount of $22,700.

IT IS FURTHER ORDERED that Boddicker's attorneys will submit, within 28 days, a summary of fees and costs associated with preparing and trying the COBRA claim. Esurance may file any objections to the fees no later than 21 days after service of the attorneys' fees requested.

Dated December 20, 2011.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE